IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. 25-cr-1075 GBW |
| | ) | |
| **JOSE FLORES-PENALOZA**, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>UNITED STATES' MOTION FOR DETERMINATION OF ELEMENTS OF CRIMES</u>

This case is currently set for trial on June 17, 2025.  The Court previously dismissed military-trespass-related charges in criminal complaints in several cases on the basis that the Government must prove that the defendant had knowledge that he or she entered the New Mexico National Defense Area (NMNDA). *See e.g.*, *United States v. Fidel Aguilar-Maldonado*, 25mj1452, ECF No. 5 (May 14, 2025). Defendant Jose Flores-Penaloza's case was not among those dismissed but the Government assumes the Court will apply the same analysis to this case. The Government factually stipulates that Defendant lacked knowledge of the NMNDA or that the land on which he unlawfully entered the United States was a restricted military installation. Pursuant to *United States v. Hall*, if the Court maintains that such knowledge is an element the Government must prove, the Court should dismiss the military trespass charges in the Information so that the Government may pursue an appeal of its decision. 20 F.3d 1084, 1088 (10th Cir. 1994) (recognizing a narrow exception to the rule that a charge cannot be dismissed before trial for lack of proof where "where the operative facts are undisputed and the government fails to object to the district court's consideration of those undisputed facts in making the determination regarding a submissible case").

## I.    BACKGROUND

In 1907, President Theodore Roosevelt determined that it was "necessary for the public welfare that a strip of land lying along the boundary line between the United States and the Republic of Mexico be reserved … as a protection against the smuggling of goods between the United States and said Republic." 35 Stat. 2136 (attached as Ex. 1). President Roosevelt accordingly reserved the land "from entry, settlement, or other form of appropriation under the public land laws and set apart as a public reservation." *Id.* For more than a century, the resulting "Roosevelt Reservation" has served as a defensive bulwark against the unlawful trafficking of persons and contraband into the United States.

The President of the United States has now assessed that "[o]ur Southern border is under attack from a variety of threats" and "[t]he complexity of the current situation requires that our military take a more direct role in securing our southern border than in the recent past." The White House, *Military Mission for Sealing the Southern Border of the United States and Repelling Invasions* (Apr. 11, 2025). Accordingly, in April, the President directed the Department of the Interior to transfer the Roosevelt Reservation to the Department of the Army, which has now incorporated it—as the New Mexico National Defense Area (NMNDA)—into the U.S. Army Fort Huachuca installation. To that end, on April 15, 2025, the Department of the Interior transferred over 109,651 acres of federal land along the Border—including the approximately 60-foot-wide Roosevelt Reservation in New Mexico—to the Department of Defense. *See* Public Land Order No. 7963. Three days later, the Secretary of the Army made these lands, now designated as the New Mexico National Defense Area (NMNDA), part of the Fort Huachuca U.S. Army installation. The same day, Fort Huachuca's commander issued a

security regulation designating the NMNDA as a restricted and controlled area under Army Regulation 190-13, which prohibits unauthorized entry onto such areas.

That action has legal consequences. Unsurprisingly, persons are not free to enter a U.S. Army installation without authorization. Equally unsurprisingly, doing so with culpable intent exposes the trespassers to criminal liability. Congress has enacted multiple statutes safeguarding the physical integrity of military areas and punishing those who would breach it. *See, e.g.*, 50 U.S.C. § 797 (subjecting to misdemeanor penalties "[w]hoever willfully violates any defense property security regulation"); 18 U.S.C. § 1382 (subjecting to misdemeanor penalties "[w]hoever … goes upon any military … installation, for any purpose prohibited by law").

On April 29, 2025, Defendant was encountered by Border Patrol in Hidalgo County, New Mexico, approximately 25 miles west of the Antelope Wells Port of Entry. ECF No. 1. Upon questioning the Defendant, he admitted to being a citizen of Mexico and illegally present in the United States. Agents determined that the location where Defendant was suspected of crossing is within the NMNDA. He was accordingly charged by criminal complaint with one count each of entering into the United States without inspection, in violation of 8 U.S.C. § 1325(a)(1); willfully violating a defense property security regulation, in violation of 50 U.S.C. § 797(a)(1); and going upon a military installation for a purpose prohibited by law or lawful regulation, in violation of 18 U.S.C. § 1382. On May 7, 2025, the Government filed an information reasserting these same charges.

## II.     ARGUMENT

The Government stipulates that Defendant lacked knowledge of the NMNDA or that the land he crossed through was a restricted military installation. Under the Court's previous analysis

of these statutes, the Government acknowledges that it cannot meet its burden of proof. *See e.g.*, *United States v. Aguilar-Maldonado*, 25-mj-1452 GBW, ECF No. 5 (May 14, 2025) ("Dismissal Order"). The Government assumes that the Court intends to apply the same analysis to the charges in this case. Nevertheless, for the reasons explained below, the Government requests that the Court revisit its prior determination regarding the mens rea required to convict under 50 U.S.C. § 797 and 18 U.S.C. § 1382. Alternatively, as the Government stipulates that Defendant lacked knowledge that he entered the NMNDA, the Government requests that the Court dismiss the NMNDA trespass counts from the Information so that the Government may pursue an appeal.

As an initial matter, the Government agrees with the Court's analysis in so far as the Court concluded that willfulness can be established by a defendant's simultaneous unlawful entry into the United States under § 797. Dismissal Order at 5-7. Furthermore, pursuant to § 1382, the Court correctly determined that a defendant who enters the NMNDA from Mexico for the prohibited purpose of entering the United States without inspection has violated the plain text of the statute. *Id*. at 11-12. But the Government submits that the Court erred in applying an additional scienter element found nowhere in the statutes that requires the Government to prove that the defendant knew he was entering designated military territory.

### A. Mens Rea for Section 797

"The mental state sufficient for commission of a federal criminal offense is a question of congressional intent," *United States v. Benton*, 988 F.3d 1231, 1238 (10th Cir. 2021), and "[t]he best evidence of congressional intent … is the statutory text that Congress enacted," *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 392 (2013).  Nowhere does Section 797 require that the

defendant have "known" or received "actual notice" that he was on or entering military property. The statute requires only that the defendant have acted "willfully," which—as the Court correctly determined—the government may satisfy by showing his culpable purpose of entering the United States without inspection.

In concluding otherwise, the Court reasoned—relying on *Bryan*—that Section 797's willfulness *mens rea* requires knowledge of all "the facts that constitute th[e] offense"; thus, because one of those facts is entry upon the NMNDA, the defendant must know he had entered the NMNDA. *See* Dismissal Order at 9-10. But that cannot be correct. The existence of the "defense property security regulation" is also among the facts constituting the offense, 50 U.S.C. § 797(a), and the Court recognized that knowledge of that regulation is unnecessary. *See id.* at 5.

Indeed, *Bryan* itself seems to reject the Court's line of reasoning. There, one of the central facts constituting the defendant's offense was his lack of a federal firearms license. *See* 524 U.S. at 189; 18 U.S.C. § 922(a)(1)(A) (prohibiting anyone "except a licensed importer, licensed manufacturer, or licensed dealer" from dealing in firearms). The Supreme Court held, however, that the statute's willfulness *mens rea* did not require the defendant even to be aware of the federal licensing requirement; he only had to be aware that his conduct was unlawful more generally. *See Bryan*, 524 U.S. at 196; *see also id.* at 189 & n.8. Although Section 797's willfulness *mens rea* is more demanding than knowledge in the sense that it requires awareness of unlawfulness, it does not require knowledge of each factual component of the offense in the manner the Court supposed. *Cf., e.g., United States v. Evans*, 74 F.4th 597, 606-07 (4th Cir. 2023) (holding that a statute prohibiting "willfully and without authority, set[ting] on fire any timber, underbrush, or grass or other inflammable material" on federal land, 18 U.S.C. § 1855,

does not require knowledge that the location of the fire is federal land).

By analogy, if a New Mexico statute prohibited "willfully entering New Mexico state property without authorization," and a defendant entered such property aware that he was trespassing, it would be no defense if he mistakenly thought he was in Arizona. Just as a defendant need not know the precise latitude and longitude of the statutory border line between the two States, he need not have specific knowledge of the Executive Order or other regulatory actions establishing the military status of the land that he trespassed upon for the purpose of illegally entering the United States. It should be sufficient that Defendant knew his presence on the land was unauthorized because he had just illegally crossed the international border.

Furthermore, the presumption of scienter is also inapposite because the NMNDA's status is a jurisdictional element. The Court appeared to ground its analysis in part in the "presumption of scienter." Dismissal Order at 8. The Court acknowledged, however, that the presumption of scienter does not apply to "a statute's 'jurisdictional elements.'" *Id.* And it recognized that certain legal characteristics of the area onto which a defendant trespassed—that it was "military property with a security regulation"—were "the jurisdictional prerequisites of the crime." *Id.* at 5. But the Court nevertheless extended the presumption of scienter to those "jurisdictional prerequisites," at least to the extent that the government must prove a defendant's "knowledge that [he] has entered the NMNDA." *Id.* at 10. Because the legal status of a defendant's entry point as a National Defense Area is jurisdictional, however, any scienter element would not reach that fact. *See Torres v. Lynch*, 578 U.S. 452, 468 (2016) ("[W]hen Congress has said nothing about the mental state pertaining to a jurisdictional element, … [c]ourts assume that Congress wanted such an element to stand outside the otherwise applicable mens rea

requirement.").

In that sense, this case is similar to *United States v. Feola*, 420 U.S. 671 (1975), in which the Supreme Court held that the federal statute penalizing assault on a federal officer, 18 U.S.C. § 111, "cannot be construed as embodying an unexpressed requirement that an assailant be aware that his victim is a federal officer." *Feola*, 420 U.S. at 684. There, as here, Congress enacted the relevant provision "to protect both federal officers and federal functions" and to "provid[e] a federal forum" for vindicating those interests. *Id*. at 679, 682. There, as here, liability depended in part on the special governmental status (there, a "federal officer," *id*. at 684; here, a "military property with a security regulation,") carried by the object of the offense. And there, the Supreme Court deemed that special status "jurisdictional" and held that "knowledge of the facts giving rise to federal jurisdiction is not necessary for conviction." *Feola*, 420 at 676, 697; see also *id*. at 694 ("[I]mposition of a requirement of knowledge of those facts that serve only to establish federal jurisdiction would render it more difficult to serve the policy behind the law … without serving any other apparent social policy.").

This case is like *Feola* in another respect as well: regardless of his knowledge of any jurisdictional fact, the defendant could be found guilty only if he acted with a culpable purpose. Just like a defendant unlawfully trespassing through the NMNDA, the defendant in *Feola* was engaged in unambiguously culpable conduct (there, assault; here, unlawful entry into the United States) but nevertheless sought to evade criminal liability on the basis of his asserted ignorance as to the special-status element. And there, the Court explained that its "interpretation poses no risk of unfairness to defendants" and "is no snare for the unsuspecting" because

> [a]lthough the perpetrator … may be surprised to find that his intended victim is a federal officer in civilian apparel, he nonetheless knows from the very outset that

> his planned course of conduct is wrongful. The situation is not one where legitimate conduct becomes unlawful solely because of the identity of the individual or agency affected. In a case of this kind the offender takes his victim as he finds him. The concept of criminal intent does not extend so far as to require that the actor understand not only the nature of his act but also its consequence for the choice of a judicial forum.

*Id*. at 685. So too here: Although the defendant "may [have] be[en] surprised to find" that he had illegally crossed into military rather than civilian territory, he knew "from the very outset that his planned course of conduct [wa]s wrongful." In deliberately entering the United States outside of a port of entry established for that purpose, the defendant must "take[] his [destination] as he finds [it]" and face the consequences of his "willful[]" conduct.

Finally, because the willfulness element already distinguishes innocent from culpable conduct, no presumption of scienter is warranted. A presumption is just that—an assumption about general practice contingent on certain facts and rebuttable by contrary indicia. Here, Congress's explicit choice of "willful[ness]" in Section 797 overrides any implicit scienter element a court might otherwise be inclined to infer.

As the Supreme Court has instructed, the presumption of scienter operates only insofar as necessary "to require a defendant to possess a culpable mental state regarding 'each of the statutory elements that criminalize otherwise innocent conduct.'" *Rehaif v. United States*, 588 U.S. 225, 229 (2019) (emphasis added). Additional knowledge—*i.e.,* about the full contours of and legal rationale for his offense—is not necessary for a defendant who both acts unlawfully and does so "willfully," or for a "bad purpose." *Bryan*, 524 U.S. at 194. When he entered the country without authorization or inspection, the defendant was not engaged in "otherwise innocent conduct," *Rehaif*, 588 U.S. at 229—nor, by definition, would any other defendant who has engaged in a "willful[]" violation of law.

8

The Court correctly determined that a defendant's "intent to illegally enter the United States can satisfy the 'willfully' requirement that Defendant knew that his conduct was unlawful under 50 U.S.C. § 797."  But the Court wrongly concluded that a presumed scienter element as to the status of the NMNDA was necessary to shield this willfully culpable defendant from liability for "otherwise innocent conduct."  Dismissal Order at 9.  Imposing an additional scienter element here fails to serve the interest that undergirds the scienter presumption:  ensuring that apparently innocent conduct by unwary persons is not subjected to unforeseeable criminal consequences.

In all events, a defendant's (correct) understanding that he had entered an area where he was not authorized to be present satisfies scienter even without his separate subjective appreciation of each reason for which his presence was unauthorized.  Just as the defendant in *Liparota v. United States*, 471 U.S. 419 (1985), was liable for food-stamp fraud—notwithstanding his asserted ignorance as to the specific underlying regulations—because he knew, as a general matter, that his conduct "was unauthorized," *id*. at 434, defendant is liable for violating Section 797—notwithstanding his asserted ignorance as to the relevant "defense property security regulation"—because he knew that his conduct was unauthorized. The Court's contrary determination cannot be squared with this foundational principle of *mens rea* jurisprudence.

### B.  Mens Rea for Section 1382

Like Section 797's requirement of "willful[]" conduct, Section 1382's express intent standard already "separate[s] wrongful conduct from 'otherwise innocent conduct.'"  *Elonis*, 575 U.S. at 736.  Simply put, no one who "goes upon a[] military … installation[] for a[] purpose

prohibited by law," 18 U.S.C. § 1382, can claim that he was engaged in "otherwise innocent conduct." And in cases where the "purpose prohibited by law" is a further crime that does not itself depend on the military status of the land, the military status of the site serves only to confer federal jurisdiction; it does not create the "wrongful[ness]" of the defendant's conduct. *See Feola*, 420 U.S. at 691 (distinguishing government's burden in cases where "the underlying offense involved an act clearly wrongful in itself" from cases where "the acts agreed to were wrongful solely because of statutory proscription").

The Court nonetheless adopted an additional knowledge-of-land-status element, on the theory that doing so was necessary to avoid a purported "absurdity." Specifically, the Court posited a motorist "driving along … a road [that passes through a military base] intending to commit a crime in the next town" and suggested that such a person "would be guilty of a 18 U.S.C. § 1382 crime by the government's logic … even if they never committed the crime when they arrived at the next town and thus had never engaged in any knowingly culpable conduct." Dismissal Order at 14.

The Government respectfully disagrees with the Court's analysis. There is nothing "absurd" about imposing liability on someone who undertakes an action—even a preliminary or inchoate one—"for a[] purpose prohibited by law." *Cf. United States v. Bindues*, 741 F. Supp. 3d 967, 1015 (D.N.M. 2024) ("The conclusion that a person groomed his victim simply is a conclusion that the accused possessed a certain wrongful *mens rea*, *i.e.*, that the accused engaged in overt or inchoate criminal conduct."). And it is not necessary for this Court to definitively determine that Section 1382 reaches all persons who—knowingly or not—merely *traverse* a military installation *en route* to a future crime. The word "for" in Section 1382 could connote an

instrumental rather than incidental relationship between the defendant's entry upon the installation and his unlawful purpose. Therefore, the statute could be read to require a nexus between the "go[ing] upon" and "purpose" elements that could limit its scope to, for example, defendants whose criminal purposes will be accomplished on the installation. But that reading encompasses defendants like Defendant who cross into the NMNDA, so this case does not implicate the Court's feared absurdity. Nor does it suggest the government could necessarily prosecute someone for merely "step[ping] on land he does not know is part of [a] base … without having any culpable intent," *Aguilar-Maldonado*, ECF No. 5 at 15; as an unlawful purpose is necessary under Section 1382. Accordingly, like the Court's determination in regard to § 797, the Government requests that the Court reevaluate its prior conclusion in regard to this charge and conclude that the statute does not contain a knowledge-of-land-status element.

## III.     CONCLUSION

The Government requests that the Court re-evaluate its prior conclusion that the Government must establish that Defendant know his presence in the NMNDA was unauthorized. Pursuant to *Hall*, should the Court reach the same conclusion as to mens rea that it reached previously, it should dismiss those counts in the Information because the government has stipulated that it cannot meet the higher mens rea standard.

Respectfully submitted,

_____
RYAN ELLISON
United States Attorney
200 N. Church Street
Las Cruces, New Mexico 88001
Phone: (575) 522-2304

I HEREBY CERTIFY that on June 11, 2025
I electronically filed the foregoing with the
Clerk of the Court using the CM/ECF electronic
filing system which will send notification to all
counsel of record.


  /s/
_____
RYAN ELLISON
United States Attorney